IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 3, 2025

**IN RE COREY M.[1]**

**Appeal from the Juvenile Court for Anderson County**
**No. 23-0891          Timothy G. Elrod, Judge**

_____

**No. E2024-00733-COA-R3-PT**

_____

This action involves the termination of a mother and father's parental rights to their minor child. Following a bench trial, the court found that clear and convincing evidence existed to establish several statutory grounds of termination as applied to each parent. The court also found that termination was in the child's best interest. We now affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KENNY W. ARMSTRONG, J., joined.

L. Rosillo Mulligan, Harriman, Tennessee, for the appellant, Sandra W.

Jennifer Chadwell, Oak Ridge, Tennessee, for the appellant, Corey Lee M.

Jonathan Skrmetti, Attorney General & Reporter, and Mara L. Cunningham, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.     BACKGROUND**

Sandra W. ("Mother") and Corey Lee M. ("Father") met in a homeless shelter in Massachusetts in 2019, shortly after Father completed his prison sentence followed by probation for an attempted murder conviction. Mother had just left an abusive relationship in which another child was removed from her custody. Mother and Father (collectively "the Parents") moved to Tennessee when Mother realized she was pregnant. Corey M.

---

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last name of the parties.

("the Child") was born in August 2021. Parents and the Child lived with Mother's brother in his basement, which was uninhabitable with standing water, mold, and a rat infestation.

The Parents were limited in their housing options, in part, due to Father's criminal history. In 2012, Father pled guilty to attempted murder in Massachusetts and was incarcerated. He was released in 2014 and placed on probation, the terms of which he completed in May 2019. Father maintained long-term employment in Tennessee. Mother was dependent upon Social Security Income ("SSI") due to a learning disability, physical ailments, and a diagnosis of epilepsy. The Parents maintained a combined income of approximately $3,000 per month;[2] however, they were unable to qualify for government housing facilities as a result of Father's income and status as a convicted felon.

At some point in 2022, other adults living in the home with the Parents stole their food and belongings. They also pulled a gun on the Parents and the Child on more than one occasion. On July 12, 2022, the Tennessee Department of Children's Services ("DCS") received a referral regarding the Child's living situation. Parents initially wanted to stay in the residence because they feared that they would lose their belongings. They ultimately accepted assistance from DCS and left the residence. DCS paid for the Parents and the Child to stay in a hotel room and worked with a local organization to find funding to further assist the Parents. TORCH, a separate agency that assists the homeless population, agreed to help and began paying for the motel room.

Parents, despite their combined income, made little to no progress on securing their own housing. They remained in the hotel from July 13, 2022, through November 21, 2022, with TORCH providing in excess of $10,000 in assistance to house the family. DCS also helped with transportation, food, diapers, and medication for the Child. The Parents often went out to eat or ordered takeout and also paid for several television streaming services, a vaping system, and an XBOX, despite repeated requests from DCS to budget and to work on securing housing for themselves and the Child.

On November 21, 2022, DCS petitioned for removal of the Child, citing the Parents' inability to care for him without continued assistance from DCS and TORCH. At that time, Mother was on a waiting list for government housing that was in the process of renovations. They did not have a set move-in date, and TORCH and DCS refused to pay for additional nights at the hotel. The trial court removed the Child and later adjudicated the Child as dependent and neglected as a result of the Parents' homelessness, inability to provide for him, and domestic abuse in the maternal uncle's home. He was placed in a foster home, where he has remained since that time.

---

[2]Father reported approximately $2,000 per month from his employment; Mother received approximately $850 per month in SSI payments.

Approximately two weeks later, Mother moved into government housing in Oak Ridge, Tennessee. Father was prohibited from residing in government housing due to his status as a convicted felon and his level of income; however, the Parents admitted that he resided there with her but was not named on the lease as an occupant.

DCS developed two permanency plans for the Parents, one dated December 8, 2022, and the other dated May 24, 2023. These plans were ratified by the trial court. The first plan contained the following requirements for the Parents: (1) obtain and maintain safe and appropriate housing; (2) complete a full psychological examination; (3) complete a mental health assessment; (4) complete parenting classes; and (5) attend supervised visitation. Additionally, Father was tasked with (1) providing proof of transportation; (2) completion of anger management classes; (3) maintaining steady employment; and (4) remitting child support. Mother was tasked with providing (1) proof of her income, (2) proof of her disability, and (3) a transportation plan as a result of her disability. The second plan contained additional requirements pertaining to drug use, namely the Parents were tasked with completing an alcohol and drug assessment and submitting to random drug screens, and to income, namely the Parents were tasked with completing a budgeting class. The Parents participated in the creation of the plans and indicated their assent to the terms. The Parents completed a number of items on the permanency plans; however, they failed to evidence improvement as a result of their completion of such items.

On April 12, 2023, Father was cited by law enforcement for driving on a suspended license. He failed to appear at his scheduled hearing on May 31, 2023. On July 3, 2023, law enforcement investigated a domestic violence incident between Father and another unrelated individual, who reported that Father pinned her against the floor, held her against her will, barricaded the door, and threw her cellular telephone against the wall. Father was in a romantic relationship with this woman, who presented with several bruises on her arms and legs from prior altercations. She filed a petition for an order of protection, reporting that Father stalked and harassed her from June through July 2023. Father was charged with domestic violence, false imprisonment, and vandalism. He resisted arrest and attempted to fight law enforcement, who ultimately tased him to complete the arrest on July 10. Father pled guilty to resisting arrest and domestic violence and received consecutive sentences, for which he served 30 days in jail and was then placed on probation.

While Mother managed not to incur criminal charges during the custodial episode, she was taken to the hospital in April 2023 based upon her claim that she overdosed on heroin, suboxone, and cocaine. She asserted that someone laced her food with these substances; however, her test results showed that she lost consciousness from a seizure, not an overdose. Drug testing also revealed a positive result for THC. On June 7, 2023, the Parents were ordered to complete hair follicle and nail bed testing. The parents did not comply until shortly before a scheduled contempt hearing three months later. Mother tested positive for tramadol and methadone without a prescription.

On August 22, 2023, DCS filed a petition for termination of Mother and Father's parental rights, citing the statutory grounds of (1) substantial noncompliance with the permanency plans; (2) the persistence of conditions which led to removal; and (3) failure to manifest an ability and willingness to assume custody of the Child. DCS pled the additional grounds of abandonment by wanton disregard as applied to Father and mental incompetence as applied to Mother.

The case proceeded to a hearing on the termination petition, beginning on February 8, 2024. On the first day of the hearing, Mother exhibited signs of distress and was removed from the courtroom by emergency personnel. It was later confirmed that she experienced a seizure. The court reconvened to continue the hearing on March 22, 2024, with Mother present. While the Parents made some progress on their permanency plans and had moved into a new home that was appropriate and safe for the Child, DCS employees testified that Father was aggressive toward them in child and family team meetings and that the Parents expended minimal effort to schedule visitation with the Child, limiting their availability to one specific two-hour window on a weekly basis. Mother also did not establish an acceptable safety plan to care for the Child. She identified the maternal grandmother as her support person; however, she previously indicated that her mother was abusive toward her and that their relationship remained strained. Testimony established that the Parents advertised online that they were seeking individuals to come to their home to engage in sexual activity while the Child lingered in foster care.

Amanda Turner, a developmental therapist, testified that the Child exhibited signs of developmental delay upon his removal from the Parents. She professed that he evidenced immediate signs of improvement once placed in the foster home. She explained that the Child's significant progress and development established that his developmental delay was the result of neglect in his environment rather than his own cognitive ability. She believed the Child would regress if returned to the Parents. Further testimony established that the Child exhibited signs of regression following visitation with the Parents, e.g., night terrors, instances of self-harm, physical aggression, and toileting regression. The Child's foster care case manager testified that the Child showed significant signs of attachment to his foster parents, referring to them as "mommy" and "daddy."

Following the hearing, DCS removed the statutory ground of noncompliance with the permanency plans. The court issued a final order in which it found that the evidence presented as applied to both parents established the statutory grounds of the persistence of conditions which led to removal and failure to manifest an ability and willingness to assume custody of the Child. The trial court also found clear and convincing evidence in support of the additional grounds of abandonment by wanton disregard as applied to Father and mental incompetence as applied to Mother. The court found that termination of each parent's parental rights was in the best interest of the Child. This appeal followed.

## II.    ISSUES[3]

We consolidate and restate the issues pertinent to this appeal as follows:

A.    Whether clear and convincing evidence supports the court's finding of statutory grounds for termination.

B.    Whether clear and convincing evidence supports the court's finding that termination was in the best interest of the Child.

## III.    STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652–53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

Although parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon statutory grounds. *See In Re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds. *In re Drinnon*, 776 S.W.2d at 97. A parent's rights may be terminated only upon

> (1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) [t]hat termination of the parent's or guardian's rights is in the best interest[ ] of the child.

Tenn. Code Ann. § 36-1-113(c). "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for the termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467,

---

[3] Mother takes issue with the juvenile court's suspension of visitation in the dependency and neglect proceeding. This issue is not properly before this court for appellate review.

473 (Tenn. Ct. App. 2000), *abrogated on other grounds by In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). "Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d at 861 (citations omitted). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

In 2016, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*In re Carrington H.*, 483 S.W.3d 507, 523–24 (Tenn. 2016) (citations omitted); *see also In re Gabriella D.*, 531 S.W.3d 662, 680 (Tenn. 2017).

In the event that the "resolution of an issue [] depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). "[T]his court gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at \*3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

# IV. DISCUSSION

## A.

As indicated above, the trial court granted the termination petition based upon the following statutory grounds: (1) the persistence of conditions which led to removal as applied to both parents; (2) failure to manifest an ability and willingness to assume custody of the Child as applied to both parents; (3) abandonment by wanton disregard as applied to Father; and (4) mental incompetence as applied to Mother. The Parents object to the court's application of each ground of termination.

### 1. Persistence of conditions

Under Tennessee law, a trial court may terminate parental rights when:

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3). Termination of parental rights requires clear and convincing evidence of all three factors. *In re Valentine*, 79 S.W.3d at 550.

*Mother*

The record reflects that the conditions which led to removal in November 2022 were child safety concerns due to homelessness, inability to provide appropriate care and supervision, and exposure to domestic violence in the maternal uncle's home. While Mother ultimately obtained appropriate housing, she continued to reside with Father, who

- 7 -

was convicted of domestic violence and resisting arrest during the custodial episode. Father likewise exhibited aggressive behavior toward DCS employees. Mother was unable to care for the Child without assistance due to her medical history of epilepsy and mental health concerns. Mother professed that the maternal grandmother, whom she accused of child abuse in the past, was available to assist her when Father was working or otherwise unavailable. This arrangement was unacceptable to the court for good reason. The record confirms that DCS provided consistent support to Mother, who evidenced little improvement and regularly put her needs and wants above the Child's need for permanency and stability. Following our review of the record, we conclude that there is little likelihood that the conditions which led to removal will be remedied at an early date and that other conditions exist that would likely cause further abuse and neglect. The continuation of Mother's relationship with the Child greatly diminishes his chances of early integration into a safe, stable, and permanent home. We affirm the court on this ground of termination.

*Father*

The record reflects that the conditions which led to removal in November 2022 were child safety concerns due to homelessness, inability to provide appropriate care and supervision, and exposure to domestic violence in the maternal uncle's home. Despite consistent income and improvements in housing, Father incurred his own domestic violence charges and exhibited aggression toward DCS employees throughout the custodial episode. Father was also cited for driving with a suspended license and resisting arrest. He, along with Mother, advertised online for additional sexual partners to come to their residence. Following our review of the record, we conclude that other conditions exist that would likely cause further abuse and neglect. The continuation of Father's relationship with the Child greatly diminishes his chances of early integration into a safe, stable, and permanent home. We affirm the court on this ground of termination.

2.      Failure to manifest an ability and willingness to assume custody

Pursuant to Tennessee Code Annotated section 36-1-113(g)(14) parental rights may be terminated when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires the petitioner to prove two elements by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c)(1), (g)(14); *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020). First, a petitioner must prove that the parent failed to manifest an ability and willingness to personally assume legal and

- 8 -

physical custody or financial responsibility of the child. *In re Neveah M.*, 614 S.W.3d at 674. Second, a petitioner must prove that placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. *Id.*

As to the first element, our Supreme Court has instructed as follows:

[S]ection 36-1-113(g)(14) places a conjunctive obligation on a parent or guardian to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child. If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied.

*Id.* at 677 (citation omitted).

As to the second element, whether placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child," we have explained:

The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Virgil W.*, No. E2018-00091-COA-R3-PT, 2018 WL 4931470, at *8 (Tenn. Ct. App. Oct. 11, 2018) (quoting *Ray*, 83 S.W.3d at 732 (footnotes omitted)).

*Mother*

Mother did not evidence an ability or willingness to assume custody of the Child. As stated previously, Mother's current living situation was tenuous due to Father's presence in the home. Mother also did not establish an acceptable safety plan to care for the Child given her medical condition and mental health issues. Despite months of financial assistance from DCS and TORCH, Mother waited until the Child was removed to secure housing and begin paying for expenses. Mother was inconsistent with visitation and advertised for additional sexual partners while the Child lingered in custody. From these facts, we agree with the trial court that Mother displayed an overall lack of an ability and willingness to assume legal and physical custody of the Child. The record further

- 9 -

supports a finding that placing the Child with her would pose a risk of substantial physical or psychological harm to his welfare given Mother's mental state, her use of illegal substances, and invitation of strangers into her home for sexual activity. With all of these considerations in mind, we affirm the court's judgment terminating Mother's parental rights on this ground.

*Father*

Our review confirms that Father did not evidence willingness to assume custody of the Child. Despite significant resources provided by DCS and TORCH, Father delayed providing for the Child and establishing a suitable home for over a year. Father was also inconsistent with visitation, resided illegally in government housing, engaged in criminal activity that led to additional time in jail, and advertised for additional sexual partners while the Child was in custody. From these facts, we hold that Father displayed an overall lack of willingness to assume legal and physical custody of the Child. The record further supports a finding that placing the Child with him would pose a risk of substantial physical or psychological harm to his welfare given Father's history of aggression and invitation of strangers into his home for sexual activity. With all of these considerations in mind, we affirm the court's judgment terminating Father's parental rights on this ground.

### 3. Abandonment by wanton disregard

Parental rights may be terminated for abandonment, as defined in Tennessee Code Annotated section 36-1-102. Tenn. Code Ann. § 36-1-113(g)(1). As relevant here, abandonment can be found when a parent who is incarcerated when the termination petition is filed has "engaged in conduct prior to, during, or after incarceration that exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv)(c). The relevant pre-incarceration period for conduct exhibiting wanton disregard referred to in section 36-1-102(1)(A)(iv) "is not limited to acts during the four-month period immediately preceding the incarceration." *In re Jeremiah T.*, No. E2008-02099-COA-R3-PT, 2009 WL 1162860, at *8 (Tenn. Ct. App. Apr. 30, 2009) (citing *In re Audrey S.*, 182 S.W.3d at 871).

"Wanton disregard" is not a defined term, but this court has "repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867–68 (citations omitted). Tennessee Code Annotated section 36-1-102(1)(A)(iv) represents the General Assembly's "commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child" and that "[i]ncarceration severely compromises a parent's ability to perform his or her parental duties." *In re Audrey S.*, 182 S.W.3d at 866. "The actions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude

involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015).

Father, a convicted felon prior to the Child's birth, engaged in continued criminal behavior following the Child's birth and subsequent removal. He was in jail at the time of the filing of the termination petition. Of note, Father lived in government subsidized housing illegally, drove with a suspended license, failed to appear in court as required, committed acts of domestic violence, and resisted arrest, all while the Child was in DCS custody. We find no error in the trial court's determination that there was clear and convincing evidence of Father's abandonment by wanton disregard.

### 4. Mental incompetence

Under Tennessee law, a court may terminate parental rights when clear and convincing evidence is provided to establish that:

> (i)  The [parent] of the child is incompetent to adequately provide for the further care and supervision of the child because the [parent's] mental condition is presently so impaired and is so likely to remain so that it is unlikely that the [parent] will be able to assume or resume the care of and responsibility for the child in the near future; and

> (ii)  That termination of [parental] rights is in the best interest of the child[.]

Tenn. Code Ann. § 36-1-113(g)(8)(B). The statute also expressly provides that no finding of willfulness is required to establish this ground. Tenn. Code Ann. § 36-1-113(g)(8)(C).

Roman Sean McPherson, a licensed psychological examiner, was confirmed by the trial court as an expert in his field. Mr. McPherson testified that he completed Mother's psychological examination over the course of three separate days in May and June 2023. He confirmed that Mother has four children, three of which were adopted out of her custody prior to the Child's birth. She reported that her parents were abusive toward her and that she has been "in and out" of relationships in which she experienced domestic violence. Based upon his clinical interview of her, psychological testing, and collateral witness statements, Mr. McPherson categorized Mother's diagnoses as Bipolar Type I Disorder, current or most recent episode depressed, with psychotic features; Post-traumatic Stress Disorder, with panic attacks; and Borderline Intellectual Functioning.

Mr. McPherson expressed serious reservations regarding Mother's ability to be a safe and appropriate caregiver for the Child given her low intellectual functioning, which inhibited her ability to develop appropriate coping skills to address her long-term mental

- 11 -

illness. He believed the severity of her mental health conditions were exacerbated by her limited cognitive ability. He professed that her cognitive limitations and mental health issues significantly impaired her judgment and problem-solving abilities. Her prognosis for successful parenting as a primary caregiver was "very low." He asserted that Mother required care from a mental health professional certified in Dialectical Behavior Therapy and that she should continue receiving psychological care to assist with managing her medication regimen to ameliorate her symptoms, e.g., hallucinations.

Allison Bradley, certified by the trial court as an expert in individual therapy, testified that she has provided general individual therapy to Mother since 2021. She was not certified in Dialectical Behavior Therapy. She believed that Mother exhibited appropriate parenting skills during their weekly therapy sessions prior to removal. She professed that Mother could function independently in many areas and was willing to learn.

Despite Ms. Bradley's testimony, the trial court found, and we agree, that Mr. McPherson's testimony was uncontroverted and established that Mother was incompetent to adequately provide for the further care and supervision of the child due to the combination of her mental condition and low intellectual functioning and that her condition was likely to remain so that it was unlikely that she would be able to resume her care and responsibility of the Child in the near future. Accordingly, we affirm this ground of termination as applied to Mother.

B.

Having concluded that there was clear and convincing evidence supporting at least one statutory ground of termination, we must now consider whether termination of each parent's parental rights was in the best interest of the Child. Tenn. Code Ann. § 36-1-113(c)(2); *In re Audrey S.*, 182 S.W.3d at 860. After a court finds that clear and convincing evidence exists to support a termination ground, "the interests of the parent and the child diverge" and the court focuses on the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877. A finding that at least one ground for termination of parental rights exists does not necessarily require that rights be terminated. *Id.* Because some parental misconduct is redeemable, Tennessee's termination of parental rights statutes recognize "that terminating an unfit parent's parental rights is not always in the child's best interests." *Id.* The facts a court considers in the best interest analysis "must be proven by a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). After making the underlying factual findings, the court "should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest." *Id.*

The statutory best interest factors applicable to this action are as follows:

(i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A)    The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B)    The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C)    Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D)    Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E)    Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F)    Whether the child is fearful of living in the parent's home;

(G)    Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H)    Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I)    Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J)    Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render

the parent unable to consistently care for the child in a safe and stable manner;

(K)    Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L)    Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M)    Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N)    Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O)    Whether the parent has ever provided safe and stable care for the child or any other child;

(P)    Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q)    Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R)    Whether the physical environment of the parent's home is healthy and safe for the child;

(S)    Whether the parent has consistently provided more than token financial support for the child; and

(T)    Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2)    When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3)     All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4)     Expert testimony is not required to prerove or disprove any factor by any party.

Tenn. Code Ann. § 36-1-113(i).  "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).  The General Assembly has also stated that "when the best interest[ ] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected."  Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).  We will group our discussion of the best interest factors "based on the overarching themes within the list of twenty factors" under the circumstances of the case because many of these factors touch on similar factual predicates and involve similar issues.  *In re Chayson D.*, No. E2022-00718-COA-R3-PT, 2023 WL 3451538, at *14 (Tenn. Ct. App. May 15, 2023).

*Mother*

At the outset, we will address Mother's contention that DCS failed to expend reasonable efforts.  "[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent." *In re Kaliyah S.*, 455 S.W.3d at 555.  The record is overwhelming with evidence of DCS's efforts prior to removal.  DCS, with assistance from TORCH, provided for this family for several months with little to no reciprocation from the Parents.  Following removal, DCS continued to assist the Parents, who limited their availability and delayed completion of certain tasks.  Mother asserts that DCS failed to comply with the Americans with Disabilities Act ("ADA") by not providing reasonable accommodations, specifically with her completion of the psychological assessment.  The ADA provides as follows:

[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. Mr. McPherson testified that he advised Mother to request assistance if needed but that she did not make any such requests.  The record is devoid of any evidence

- 15 -

of discrimination in DCS's coordination of services for Mother, that Mother ever requested any reasonable accommodations, or that DCS denied any requested reasonable accommodations as a result of her disability. In consideration of the foregoing, we conclude that DCS's expended reasonable efforts under the circumstances presented. Tenn. Code Ann. § 36-1-113(i)(1)(L).

We consider next the Child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect wellbeing), (D) (concerning the parent-child attachment), (E) (concerning visitation), (F) (concerning whether the children are fearful of the parent), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's mental and emotional fitness and its corresponding impacts). With respect to these factors, the Child has lived with his foster parents in a stable environment for the past three years. He evidenced signs of attachment with his foster family and signs of regression following visitation with Mother. Questions remain as to Mother's mental and emotional fitness as evidenced by her psychological assessment with Mr. McPherson. Mother's visitation with the Child was inconsistent following removal and limited by Mother's failure to complete certain requirements and by her availability.

We turn next to the Child's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent's home triggers or exacerbate the children's experience of trauma or post-traumatic symptoms), (N) (concerning whether someone in the home has shown brutality or physical abuse toward other children or adults), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the children's needs), and (R) (involving the health and safety of the home). Mother has failed to establish her ability to provide a suitable home without assistance from others. She is dependent upon her current partner, who incurred additional criminal charges and convictions during the custodial episode relating to his domestic abuse of another partner. She suggested her mother as a secondary support person; however, she identified her mother as a prior abuser. Evidence was also presented to establish that Mother advertised online for additional sexual partners to come to her home while the Child was in DCS custody. Mother also failed to provide safe and stable care for three other biological children that have been removed from her care and adopted.

Next, we consider Mother's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the children's needs), (J) (involving the parent's lasting adjustment of circumstances), and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal). Mother has not exhibited a sense of urgency in addressing the circumstances which led to removal and has not yet established a lasting adjustment of circumstances.

With regard to support and knowledge of the Child's needs, Tenn. Code Ann. § 36-

- 16 -

1-113(i)(1)(S) (addressing the parent providing more than token support), (P) (addressing the parent's understanding of their needs), the record reflects that Mother was not tasked with remitting support due to her low income. She has not shown an understanding of the Child's needs while he has remained in DCS custody.

The trial court considered all the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination. Upon our review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record supports a determination that termination of Mother's parental rights was in the Child's best interest.

*Father*

We consider first the Child's emotional needs. *See* Tenn. Code Ann. § 36-1-113(i)(1)(A) (concerning the need for stability), (B) (concerning how changes in caretakers affect wellbeing), (D) (concerning the parent-child attachment), (E) (concerning visitation), (F) (concerning whether the children are fearful of the parent), (H) (concerning attachment to others), (I) (concerning relationships with others), (T) (concerning the parent's mental and emotional fitness and its corresponding impacts). With respect to these factors, the Child has lived with his foster parents in a stable environment for the past three years. He evidenced signs of attachment with his foster family and signs of regression following visitation with Father. Questions remain as to Father's fitness as a parent as evidenced by his criminal behavior while the Child was in custody. Further, his visitation with the Child was inconsistent following removal and limited by his failure to complete certain requirements and by his availability.

We turn next to the Child's physical environment and well-being. *See* Tenn. Code Ann. § 36-1-113(i)(1)(G) (concerning whether the parent's home triggers or exacerbate the children's experience of trauma or post-traumatic symptoms), (N) (concerning whether someone in the home has shown brutality or physical abuse toward other children or adults), (O) (involving the parent's prior provision of safe and stable care to any child), (Q) (involving the parent's commitment to having a home that meets the children's needs), and (R) (involving the health and safety of the home). Father has incurred additional criminal charges and convictions during the custodial episode relating to his domestic abuse of another partner. Evidence was also presented to establish that Father advertised online for additional sexual partners to come to his home while the Child was in DCS custody.

Next, we consider Father's efforts. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C) (involving the parent's continuity in meeting the children's needs), (J) (involving the parent's lasting adjustment of circumstances), and (M) (concerning the parent's sense of urgency in addressing the circumstances that led to removal). Father has not exhibited a sense of urgency in addressing the circumstances which led to removal and has not yet established a lasting adjustment of circumstances.

- 17 -

With regard to support and knowledge of the Child's needs, Tenn. Code Ann. § 36-1-113(i)(1)(S) (addressing the parent providing more than token support), (P) (addressing the parent's understanding of their needs), the record reflects that Father has not shown an understanding of the Child's needs while he has remained in DCS custody.

The trial court considered all the evidence, weighed the credibility of the witnesses, and concluded that the best interest factors supported termination. Upon our review of the evidence, we agree with the trial court's assessment and findings. Accordingly, we conclude that clear and convincing evidence in the record supports a determination that termination of Father's parental rights was in the Child's best interest.

## V.     CONCLUSION

The judgment of the trial court is affirmed. The case is remanded for such further proceedings as may be necessary. Costs of the appeal are taxed equally to the appellants, Sanda W. and Cory Lee M.

_____
JOHN W. McCLARTY, JUDGE